UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

LILY ANN YEGGY,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )      No.  1:14CV001 TIA
                                         )
CAROLYN W. COLVIN,                       )
Commissioner of Social Security,         )
                                         )
            Defendant.                   )

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

suit involves an Application for Supplemental Security Income under Title XVI of the Act.

Claimant has filed a Brief in Support of her Complaint, the Commissioner has filed a Brief in

Support of her Answer, and Claimant has filed a Reply thereto.  The parties consented to the

jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.      Procedural History**

On September 13, 2010, Claimant Lily Ann Yeggy filed an Application for Supplemental

Security Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381,

et. seq.  (Tr. 216-22).[1]  Claimant states that her disability began on November 11, 2010,[2] as a

result of seizures, bipolar, borderline personality disorder, PTSD, and fibromyalgia.  (Tr. 81).  On

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 13/filed March 12, 2014).  The record shows that Claimant has filed four previous
applications for disability insurance and the instant application is her fourth application for SSI
benefits.  (Tr. 181-222).

[2]Although Claimant originally alleged an onset date of December 1, 2006 in her application,
she amended her onset date to November 11, 2010.  (Tr. 15, 34, 242).

initial consideration, the Social Security Administration denied Claimant's claims for benefits.  (Tr. 83-87).  Claimant requested a hearing before an Administrative Law Judge ("ALJ").  On February 6, 2012, a hearing was held before the ALJ who issued an unfavorable decision on August 12, 2012.  (Tr. 7-22, 31-68).[3]  After considering the unsigned memorandum attached to her request for review, the Appeals Council found no basis for changing the ALJ's decision on January17, 2014.  (Tr. 1-5, 391-92).

## II.    Evidence Before the ALJ

### A.  Hearing on February 6, 2012

#### 1.  Claimant's Testimony

At the hearing on February 6, 2012, Claimant testified in response to questions posed by the ALJ and counsel.  (Tr. 31-60).  At the  time of the hearing, Claimant was thirty-two years of age.  (Tr. 37).  Claimant has two children, one lives in St. James with his father, and her other son lives with her father in Rolla.  (Tr. 37).  She lives with her boyfriend of four months, and he pays the bills.  (Tr. 48).  She stands at five feet four inches and weighs 169 pounds.  (Tr. 57).  She has Medicaid.  (Tr. 59).  Her doctor told her not to drive until her seizures are under control.  (Tr. 48).

Claimant testified that she has been hospitalized for two weeks twice at the Phelps County Hospital in Rolla for nervous breakdowns and once in a hospital in Georgia for a nervous breakdown.  (Tr. 39-40).  Claimant testified that during the third hospitalization, she received the diagnosis of bipolar.  (Tr. 40).  At one point she took medications for bipolar disorder but then she lost touch with her psychiatrist, and she has not been able to find another psychiatrist.  She

---

[3]Claimant testified and was represented by counsel.  (Id.).  Vocational Expert Barbara Meyers also testified at the hearing.  (Tr. 31-68, 169-70).

just returned to her family doctor who prescribed Klonopin and Cymbalta a couple days earlier. Claimant noted she had not been taking any psychiatric medications for a couple of years. (Tr. 40).

Claimant testified that she cannot drink due to pancreatitis. (Tr. 41). She was addicted to meth for almost a year three years ago. She has been clean for four years. (Tr. 41).

Claimant testified that she last worked for three to four months at Eagle's Stop in November 2010. (Tr. 42). She cannot work because of her seizures, and she testified that she has three to four small seizures each week and big seizures two to three times a month. (Tr. 42-43). She started experiencing seizures in December 2005. (Tr. 51). When she has a petit mal seizure, she stiffens up, quakes, and then goes limp. (Tr. 52). The seizure lasts for a couple of minutes. She comes out of the seizure pretty quickly but she has a bad headache and feels weak. She has to lie down. (Tr. 52). She testified most of the seizures take place at night. (Tr. 53). When she has a grand mal seizure, she passes out, and she has no control over her body. (Tr. 52). The seizure comes out of the blue, and she has no memory of the seizure, and it takes three days to recover from the seizure. (Tr. 53).

Claimant testified that the only difficulty she has with her mental functioning is her inability to remember things. (Tr. 54). She feels depressed pretty much all of the time. She attempted suicide two years ago after being beaten by a boyfriend and seeking help from her father. Dr. David Chang performed reconstructive surgery in December 2010. (Tr. 58). She has not had any suicidal thoughts recently. (Tr. 54). When she is feeling depressed or stressed, she goes online and talks to friends. (Tr. 55). She has never had any difficulty getting along with any of her coworkers or customers in the past at work. (Tr. 55). She becomes nervous when she is in the

general public and starts feeling like she is about to have a panic attack. (Tr. 56).

Her family doctor is treating the seizures, and she is looking for another neurologist because her last neurologist stopped the overnight EEG testing due to her request to reschedule due to pain from pancreatitis. (Tr. 43). Claimant testified taking Topamax helps cut down the seizures. (Tr. 47). Dr. Beard started her on a new medication. She experiences migraine headaches after every seizure, and she has medications and sometimes has to go to the emergency room for an Imitrex shot. (Tr. 47). She testified that when she has a bipolar attack every three to four months, she has difficulty interacting with other people. (Tr. 45). She also has PTSD so she cannot handle any loud noise such as a car back firing, a door slamming, or someone yelling. (Tr. 46). She has a PTSD attack almost every day. (Tr. 46). Claimant testified that she is not in counseling because she has not been able to find a counselor. Her asthma is under control with medications including an inhaler. (Tr. 46).

During the day, Claimant spends time on the computer, cleaning the house, cleaning her room, doing general things around the house, taking care of her dog, and helping her boyfriend with his daughter. (Tr. 48). She injured her back in a recent car accident, and she had been receiving treatment but was released from treatment in order to get the settlement. (Tr. 49). She leaves the house to go grocery shopping. (Tr. 56).

The ALJ observed Claimant to be using crutches. (Tr. 50). She explained something popped in her knee the other night. (Tr. 50). The doctor prescribed a straight brace and indicated she might need surgery. (Tr. 51).

The ALJ asked Claimant to verify the five jobs, cashier, deli worker, a store clerk, and a waitress, listed on her work history report, each of the jobs lasting no more than a couple of

months.  (Tr. 61).

## 2.  Testimony of Vocational Expert

Vocational Expert Barbara Meyers testified at the hearing.  (Tr. 60-67).

The ALJ asked Ms. Meyers to consider that

[t]he claimant testified that she is 32 years old.  She is a resident of Missouri and we don't have a vocational history so I'm going to ask you to assume a person who's able to do -- well, a hypothetical person capable of performing light work with the following limitations.  Frequent climbing ramps or stairs.  Never climbing ladders, ropes, or scaffolds.  Frequent stoop, knell, crouch, crawl.  Avoided concentrated exposure to extreme cold, extreme heat, extreme wetness, extreme humidity.  Avoiding concentrated exposure to extreme vibration.  Concentrated exposure to irritants and chemicals.  Concentrated exposure to operational control of moving machinery.  And avoiding concentrated exposure to unprotected heights and hazardous machinery.  Work limited to simple, routine tasks with only occasional interaction with the public.  I ask whether or not there are any jobs in the economy, in the regional or national economy, that this hypothetical person could perform?

(Tr.63).  Ms. Meyers indicated such hypothetical person could perform at the light and unskilled level as a retail marker with 27,000 jobs in Missouri and 1,5000,000 nationally; a folding machine operator with 1,100 jobs in Missouri and 31,000 nationally; a collator operator, with 1,200 jobs in Missouri and 115,000 nationally.  (Tr. 64).  When asked if the individual would only be able to perform sedentary work, Ms. Meyers listed sedentary and unskilled jobs such as a document preparer with 800 jobs in Missouri and 30,000 nationally; a circuit board assembler, with 1,100 in Missouri and 55,000 nationally; and a table worker with 200 jobs in Missouri and 25,000 nationally.  (Tr. 64).

The ALJ next asked Ms. Meyers to assume

if this individual could not sustain a regular eight hour a day, five day a week, 40 hour work week on a regular and continuing basis, would there by any jobs that would remain for this hypothetical claimant?

(Tr. 64-65). Ms. Meyers responded no. (Tr. 65). Ms. Meyers indicated employers customarily expect their employees not to have more than two unexcused or unscheduled absences a month and any more than two absences is generally unacceptable. She agreed if an employee exceeded those customary limits on a regular basis, this would eliminate the jobs cited and preclude work in the competitive marketplace. (Tr. 65).

Counsel asked Ms. Meyers to assume the ALJ's first hypothetical and include the further limitation "that this hypothetical person would be unable to adapt to changes in the workplace even if those are routine and would be unable to interact appropriately with the general public, and coworkers, and supervisors on a sustained basis. Could these jobs still be performed?" (Tr. 66). Ms. Meyers responded no. (Tr. 66).

The ALJ asked Ms. Meyers if the jobs she cited would be available to a person who could only tolerate occasional changes in the work setting. (Tr. 67). Ms. Meyers noted how the jobs cited are simple and unskilled jobs so there would not be a lot of changes in the work setting. The ALJ asked in such jobs, would a person be able to do the jobs if the person only had occasional interaction with coworkers or supervisors. Ms. Meyers explained the jobs cited were jobs people can do independently, these are not jobs where workers are required to work as a team. (Tr. 67).

### 3. Forms Completed by Claimant

In the Disability Report - Adult, Claimant reported she stopped working on July 30, 2008 after she was fired from the job. (Tr. 272-82).

In the Function Report - Adult, Claimant reported her daily activities as waking up and eating breakfast and then straightening the house. (Tr. 301). She eats dinner and then does the dishes. (Tr. 301). She can clean and do the laundry. (Tr. 303). She listed reading, watching

television, and doing embroidery as her interests.  (Tr. 305).

In the Report of Contact, a DDS employee noted how Claimant's family doctor is refilling psychiatric medications, and she does not receive psychiatric care.  (Tr. 319).

## III.   Medical Records and Other Records

On December 27 ,2004, Claimant was admitted to St. Vincent Health System because of eleven years of untreated auditory hallucinations.  (Tr. 394).  Schizoaffective disorder is included in the final diagnosis.  (Tr. 394).

In the January 21, 2005 treatment note, Dr. Felts noted how she continues to have problems with asthma but she continues to smoke a half a package of cigarettes each day.  (Tr. 404).

On June 9, 2005, Claimant was hospitalized on a 96-hour hold at Phelps County Regional Medical Center from Sullivan Hospital.  (Tr. 420).  She reported she used to see a psychiatrist in Arkansas until a year ago when she moved to St. James and has not seen a psychiatrist but Dr. Felts, her primary care physician, prescribes her medications.  After having an argument with her fiancé, she felt overwhelmed and agitated and ended up cutting her wrists.  She reported having a history of traumatic experiences when she experienced a lot of physical abuse by her ex-husband. She smokes a package of cigarettes a day.  She took some of her cousin's pain medication, and this showed up in her urine as a tricyclic antidepressant and narcotic pain medication.  (Tr. 420). She reported living with fiancé in St. James and losing her job in communication research one month earlier.  (Tr. 421).  In the June 13 Discharge Summary, the doctor noted how lately she has gone through extra stress including having family-related problems, a problem getting along with her father, and losing her job.  (Tr. 423).  She cuts herself to relieve tension.  (Tr. 423).  The

doctor noted how she showed significant improvement.  (Tr. 424).

On January 23, 2008, she sought treatment in the emergency room for back pain after a seizure.  (Tr. 504-05). The radiology reports showed an unremarkable spine and thoracic spine. (Tr. 506-07).  The CT scan of her head showed a stable negative study, and the doctor encouraged her to have a MRI.  (Tr. 508).

On February 17, 2008, she presented in the emergency room for treatment of a headache. (Tr. 501-02).  A CT of her head showed no acute process.  (Tr. 503).

After experiencing four seizes, she sought treatment in the emergency room on February 19, 2008.  (Tr. 550).  She reported having a headache, taking medication but no relief, and then having the seizures lasting fifteen to twenty minutes.  (Tr. 552).

On February 20, 2008, Dr. M. Choudhary evaluated Claimant at the Rolla Neurology Pain and Sleep Center for seizures starting in December 2007.  (Tr. 478).  Dr. Choudhary performed an EEG and the results showed abnormality due to presence of intermittent sharp transient and isolated spikes noted bilaterally.  She opined in an appropriate clinical setting, the results may be consistent with seizure disorder, and she recommended clinical correlation.  (Tr. 478). Neurological examination showed Claimant to have a normal attention span and concentration. (Tr. 480).  Dr. Choudhary noted how she seemed to "have generalized tonic clonic seizures as well as complex partial seizures."  Dr. Choudhary continued her current medication regimen and prescribed Fioricet and increased her dosages of Depakote and Dilantin. (Tr. 480).

Claimant received treatment in the emergency room on February 21, 2008 complaining of low back pain and left knee pain after slipping on ice.  (Tr. 544).  The x-ray of her left knee showed mild osteoarthritis and small joint effusion.  (Tr. 549).

On March 12, 2008, she sought treatment in the emergency room for seizures. (Tr. 539-41). She reported taking Dilantin but she was uncertain if she had taken her dose that day. (Tr. 541). Although she has a prescription needing to be refilled, she was unable to do so because of a problem. (Tr. 541). On March 21, Claimant presented in the emergency room for treatment after having two seizures. (Tr. 534-36). She reported having daily seizures. (Tr. 536).

In follow-up on March 5 and 18 and October 29, 2008, and February 12 and March 5, 2009, Dr. Choudhary treated Claimant. Her handwritten notes are for the most part illegible. (Tr. 473-77). Dr. Choudhary prescribed medications as treatment. (Tr. 573-77).

On January 21, 2009, Claimant presented for treatment of a headache/migraine in the emergency room. (Tr. 497-98). She returned for treatment of a seizure on February 22. (Tr. 499-500).

On February 5, 2009, Dr. Thomas Spencer completed a psychological evaluation on referral to assist in the determination of Medicaid eligibility. (Tr. 1009). She reported not having any health coverage and her medications costing in excess of $1,000 each month. She reported having diagnosis of bipolar disorder, PTDS, borderline personality disorder, and seizures. (Tr. 1009). Although she reported having three psychiatric hospitalizations, she has not had any psychiatric follow-up for the last two years since being discharged. (Tr. 1010). She reported last working in August 2008 but she was fired because she was late. (Tr. 1011). She indicated that she planned to file for disability and denied any alcohol use/abuse present and past. Her daily activities include watching television, cleaning around the house, and cooking. (Tr. 1011). Dr. Spencer included major depressive disorder, recurrent, moderate, bipolar disorder by history, and problems related to primary support system, occupation, economic, and access to health care.

(Tr. 1013). Dr. Spencer opined that she has a mental illness which would interfere with her ability to engage in employment, and his prognosis is guarded. (Tr. 1013).

In follow-up on February 12 and March 5, 2009, Dr. Choudhary treated Claimant. Her handwritten notes are for the most part illegible. (Tr. 473-77, 615). Dr. Choudhary prescribed medications as treatment. (Tr. 573-77).

On May 22, 2009, she sought treatment in the emergency room for two seizures five minutes apart and head pain after hitting her head on the floor. (Tr. 527). The CT of her head showed no acute intracranial abnormality. (Tr. 533). Her diagnosis was grand mal seizure. (Tr. 528). On May 26, Claimant presented in the emergency room complaining of arm pain and reported being treated on May 22 for seizures. (Tr. 525).

On July 13, 2009, she returned to Ozark Health Services for medication review. (Tr. 556). Her diagnosis included borderline personality disorder, tobacco use disorder, fibromyalgia, asthma, bipolar disorder, and seizure disorder. (Tr. 557). The treatment note reflects that in June 2007, she had significant marijuana and Vicodin use but she no longer uses. She reported having bad muscle spasms in her back the last couple of days. (Tr. 557). Dr. Felts diagnosed her with fibromyalgia four months earlier and prescribed Elavil. (Tr. 558). She reported not having any seizures on current Dilantin dose and has not seen a psychiatrist since she was hospitalized at the Stress Center in Rolla in 2006 or 2007. (Tr. 558).

On October 12, 2009, she received treatment in the emergency room for abdominal pain. (Tr. 522). She reported being raped one month earlier and has had severe abdominal pain since and has been seen multiple times in the emergency room and received morphine for pain. (Tr. 522).

In follow-up treatment at Ozark Health Services on October 13, she reported being attacked a month ago. (Tr. 565). Claimant was knocked out from behind and woke up in the park with her pants pulled down. She sought treatment in the emergency room but no rape kit was done. (Tr. 565). She believed she was assaulted because she has been receiving threats and had paid protection money. (Tr. 566). The psychiatric examination showed her to have a normal mood and affect, her behavior to be normal, and judgment and thought content to be normal. (Tr. 566). She returned on October 28 for treatment of a bad cough. (Tr. 573). She reported having a seizure that morning. Her diagnosis included acute sinusitis, bronchitis, asthma, migraine, and lipoma, and the doctor prescribed medications as treatment. (Tr. 573-76).

The November 9, 2009 radiology report of her chest showed interval development of patchy airspace opacity in the right upper lung base, possible pneumonia. (Tr. 484).

On January 3, 2010, she presented in the emergency room complaining of two seizures, each lasting a few seconds, and fatigue. (Tr. 519, 665-70). Claimant returned on January 9 complaining of a headache, seizures, and left knee pain. (Tr. 671-72). The CT of her brain showed no acute intracranial abnormality. (Tr. 675-76, 682). The x-ray of her left knee showed beginning of some minimal osteoarthritis change. (Tr. 677, 681). Common migraine and derangement of left knee were the diagnosis listed. (Tr. 678).

On January 9, 2010, Claimant sought treatment in the emergency room for a migraine headache and seizures. (Tr. 510). The CT of her brain showed no acute intracranial abnormality. (Tr. 512, 517). The MRI of her left knee showed the beginning of some minimal osteoarthritis change. (Tr. 513, 518). Her diagnosis included common migraine and derangement of left knee. (Tr. 516).

In follow-up treatment on February 2, 2010 at Ozark Health Services, she reported difficulty walking and hard to move because of her left knee injury a few years ago. (Tr. 579). She reported not seeing Dr. Choudhary recently "because levels weren't going up despite taking high levels of medicine." (Tr. 580). She reported being treated in the emergency room for a couple of seizures, and her Dilantin level was very low even though she takes her Dilantin. (Tr. 580).

On March 13, 2010, Claimant presented to the emergency room complaining of abdominal pain. (Tr. 651-52). The radiology report showed no acute abnormality. (Tr. 652).

On March 18, 2010, Claimant was admitted to Phelps County Regional Hospital for treatment of acute pancreatitis and "known for seizure disorder, being followed by Dr. Choudhary, with ongoing medication adjustment." (Tr. 585). She reported that her antiseizure medications are being adjusted by tapering off her Dilantin and starting Keppra. She requested to be discharged because she wanted to seek follow-up treatment with Dr. Choudhary the next day. (Tr. 585). Her discharge medications included Vicodin, Seroquel, Depakote, Elavil, Keppra, and Phenytoin. (Tr. 586). She reported having seizures every other day and not being able to work because of her seizure disorder. (Tr. 587). The doctor questioned her compliance with her medications. (Tr. 589, 598). Her seizure frequency is variable. (Tr. 590). She admitted to having a history of illicit drug use and last using marijuana in July 2009. (Tr. 588). The CT of her abdomen showed no acute abnormality. (Tr. 599). Discharge activity stated as tolerated but she was advised not to drive or swim by herself or work at heights unsupervised. (Tr. 586).

While in the hospital, Dr. Choudhary treated her in consultation. (Tr. 590-92). Dr. Choudhary tapered her Dilantin dosage noting how she claims she is taking Dilantin, but her levels

are always low.  (Tr. 592).  The EEG showed abnormal results due to the presence of slowing of the EEG background activity consistent with mild encepthalopathy which may be related to metabolic, toxic, anoxic, infectious, or postictal; and the presence of intermittent slow-sharp transients and a few isolated sharp discharges in the left anterior to mid temporal region.  (Tr. 602).  Dr. Choudhary opined this result "raises the possibility of structural/vascular involvement in that region.  In the appropriate clinical setting, this is consistent with seizure disorder.  Clinical correlation is recommended."  (Tr. 602, 612).  In follow-up treatment on March 22 and May 6, Dr. Choudhary adjusted her medications.  (Tr. 614).  The treatment notes are largely illegible.  (Tr. 614).

On April 4, 2010, she received treatment in the emergency room after scratching both her wrists but reported she is not suicidal.  (Tr. 650).  The clinical impression included depression and anxiety.  (Tr. 658).  The blood test showed she had subtherapeutic levels of medication.  (Tr. 661).

On April 22, 2010, Dr. Joseph Long, a clinical psychologist, evaluated Claimant on referral by Disability Determinations.  (Tr. 607).  Dr. Long observed Claimant often picked at her wrists, a behavior which was made obvious the significant scarring that resulted from years of self-mutilation.  (Tr. 607).  No one believed her when she reported being raped by her older brother for four years and then raped by an older neighbor.  (Tr. 608).  She has worked as a housekeeper and a cashier, but she has never held a job for longer than five months.  She reported having three involuntary hospitalizations and going to the emergency room two weeks ago after making sixteen slices on her wrists.  (Tr. 608).  She reported her primary care physician prescribes her psychotropic medications, because she has not met with a psychiatrist in the last few years.

(Tr. 609).  She became addicted to meth in late 2008, and she completely stopped using meth in

August 2009 without going through rehab.  She started having grand mal and petit mal seizures in

2005 and continues to have them on a daily basis despite taking Keppra.  She smokes two

packages of cigarettes each day and receives Medicaid and food stamps.  Dr. Long found she has

bipolar disorder/mixed, history of marijuana and meth dependence in reported remission, probable

PTSD, and severe borderline personality disorder.  Dr. Long found her ability to understand and

remember is intact, her ability to sustain concentration and persist with tasks to be moderately

impaired, and her social and adaptive functioning to be markedly impaired.  (Tr. 609).

On May 2, 2010, she presented in the emergency room reporting having started Keppra

one month earlier and starting to have suicidal thoughts and cutting.  (Tr. 648).  She has a skin

rash and cellulitis on her right forearm.  (Tr. 648).  She received treatment, and the doctor

recommended she get on Pathways list.  (Tr. 649)

In the May 13, 2010 Psychiatric Review Technique, Dr. Deborah Doxsee found she has

bipolar disorder/mixed, probable PTSD, and a history of marijuana and meth dependence in

reported remission.  (Tr. 616-23).  With respect to functional limitations, Dr. Doxsee found her to

be moderately limited in her ability to maintain social functioning, and concentration, persistence,

or pace and mildly limited in her activities of daily living.  (Tr. 624).  Dr. Doxsee noted "[d]ue to

lack of medical evidence, a CE was purchased."  (Tr. 626).  Dr. Doxsee opined that it appears she

has moderate limitations in social functioning and concentration, persistence and pace.  Further,

Dr. Doxsee found Claimant retains the ability to perform simple work, although due to her

limitations in social functioning, she would need to perform work with little social interaction.

(Tr. 626).

In the Mental Residual Functional Capacity, Dr. Doxsee found Claimant to be moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods. (Tr. 627). Dr. Doxsee further found her to be moderately limited in her ability to get along with coworkers. (Tr. 628). Dr. Doxsee noted she can interact adequately with peers and supervisors in a work like setting. (Tr. 629).

On May 26, 2010, Claimant presented in the emergency room with seizures and the associated symptom of a headache. (Tr. 631-35). The emergency room doctor treated her with medications. (Tr. 642). The CT of her showed normal results. (Tr. 636).

On June 9, 2010, she received treatment in the emergency room for seizures. (Tr. 646-47). Claimant returned on June 26 complaining of abdominal pain. (Tr. 683-89). The radiology views of her abdomen showed nonspecific gas pattern with stool diffusely noted in large colon. (Tr. 686, 690).

On September 7, 2010, Claimant presented in the emergency room for treatment of a headache after having two seizures. (Tr. 733). She reported seeing a neurologist in Rolla, but she does not want to return for treatment due to a domestic dispute. (Tr. 733). After being treated with a Compazine IV, her symptoms were much improved, and she was discharged. (Tr. 736-38). The blood test showed she had subtherapeutic levels of medication. (Tr. 736).

On September 19, 2010, Claimant sought treatment of a seizure in the emergency room. (Tr. 692-93). On October 7, she reported having three seizures lasting seven minutes in duration. (Tr. 694). The emergency room doctor continued her medications and ordered her to follow-up with Dr. Sher. (Tr. 695).

On October 1, 2010, Claimant established care with Dr. Beard at the Family Medicine Clinic and sought care for her migraines and seizures. (Tr. 701). She reported having seizures two to three times a day and having been in the emergency room multiple times for treatment. She is currently taking Tegretol and Depakote for the seizures and Fioricet for the migraines and wanted to know if there is anything else she could do. Claimant indicated that she has no other issues or concerns as her other issues are at least partially controlled at this time. (Tr. 701). Psychiatric examination revealed no anxiety or depression. (Tr. 702). She reported smoking a pack of cigarettes each day, but she does not use alcohol or illicit drugs. (Tr. 703). Dr. Beard planned on moving Claimant to a long acting form of Depakote for her uncontrolled seizures and prescribed Phenercan and Imitrex to help her migraines. (Tr. 703-04).

Dr. Beard treated her migraines and seizures on October 8 in scheduled follow-up. (Tr. 722-25). Claimant returned on October 20 and reported doing much better but still not perfectly controlled. (Tr. 712). The new dose of Depakote seems to be working well and her seizures no longer occur daily but once a week. (Tr. 712). Dr. Beard continued her medication regimen. (Tr. 714-15).

On November 3, 2010, Dr. Lanigar evaluated Claimant's seizures on referral by Dr. Beard and noted how her episodes prior to a few weeks ago were occurring on a daily basis and after medication adjustments to her Depakote and Tegretol, her episodes have become less frequent with the last one occurring three days ago. (Tr. 708). She had previously been on Keppra which caused her to cut herself. Dr. Lanigar noted Claimant has a history of multiple head injuries from abusive relationships and a history of physical and mental abuse according to patient. (Tr. 708). She reported being employed as a cashier. (Tr. 709). Dr. Lanigar opined she has a history of

suspected complex partial seizures and refractory migraine headaches. (Tr. 710). She requested

being taken off Depakote due to weight gain. Dr. Lanigar instructed her to taper off Depakote

and switched her to Topamax. Dr. Lanigar switched her Tegretol over to Carbatrol and noted she

has had problems with compliance in the past and recommended an EEG and MRI of her brain.

(Tr. 710).

The November 8, 2010 MRI of her brain results were unremarkable. (Tr. 867).

In the November 18, 2010, Psychiatric Review Technique, Dr. Mark Altomari found there

to be insufficient evidence to establish Listing 12.04 or 12.06. (Tr. 756). In support, Dr.

Altomari noted how a consultative examination had been scheduled due to the lack of medical

evidence. (Tr. 757). Dr. Altomari noted how she sought treatment in the emergency room on

April 4, 2010 for depression and anxiety, and on May 2, 2010, for skin rash and cellulitis on her

right forearm. During treatment for her seizures on October 15, she did not report any anxiety or

depressive symptoms. Dr. Altomari opined that he is unable to assess the severity of her current

mental health issues due to the lack of ADLs. (Tr. 757).

In follow-up treatment on November 19, 2010, Claimant reported overall she is doing

much better and after starting Topamax and Carbatrol, she is doing okay with her seizures. (Tr.

826). She is having headaches and requested a Toradol/Phenergan shot and a referral to an ENT

for her persistent nosebleeds. She had no other issues or concerns. (Tr. 826). Dr. Beard

continued her medication regimen and administered a Toradol/Phenergan shot. (Tr. 829). On

December 1, she sought treatment for a left ear ache. (Tr. 823). Dr. Beard prescribed Percocet

and Bactrim and administered Pheneran. (Tr. 824).

On December 28, 2010, Dr. David Chang performed a nasal septal deviation and

addressed her nasal deformity after nasal injury. (Tr. 771). Claimant has a history of nasal trauma, and she presented for operative management because of continued nasal deformity and airway obstruction. (Tr. 772-74). In follow-up treatment, she reported her breathing to be much improved. (Tr. 765-66). On February 17, 2011, Dr. Chang observed a good airway. (Tr. 765-66). In follow-up treatment on May 9, she reported no issues or concerns and her breathing is "doing great." (Tr. 763-64).

On December 30, she presented in the emergency room complaining of nausea and vomiting. (Tr. 886). After treatment, she was discharged as stable and directed to continue taking antibiotics and follow post-op instructions. (Tr. 888).

Claimant reported having a headache and being dizzy during treatment in the emergency room on January 19, 2011. (Tr. 882).

The January 19 MRI of her brain showed no evidence of acute ischemia/infarction and mild left maxillary and ethmoid sinus disease. (Tr. 865-66).

In follow-up treatment on January 21, 2011, she reported increased headaches after nasal deviation surgery and more anxiety and stress and requested Klonopin be prescribed. (Tr. 819). Dr. Beard continued her medication regimen and prescribed Zofran and Klonopin. (Tr. 822).

On March 14, 2011, she reported having an acute issue of left knee pain and requested a refill of her pain medications and Klonopin. (Tr. 815). Dr. Beard gave her straight leg raises and refilled her medications. (Tr. 818).

The March EEG findings showed normal results, and no evidence of postictal slowing or any focal epileptiform abnormality. (Tr. 864). The study was performed to evaluate for epileptiform activity, and the tech observed she had a seizure-like clinical behavior during the

application of the EEG, but she was able to answer questions a couple of minutes after the spell. (Tr. 863).

Claimant reported upper abdominal pain after drinking quite a bit the night before and multiple episodes of nausea and vomiting during treatment in the emergency room on April 5, 2011. (Tr. 878). After being given IV fluids and morphine, she reported feeling better. (Tr. 881). The doctor found her symptoms are due to gastritis as a result of her drinking. (Tr. 881).

On April 6, 2011, Dr. Lanigar reported how Claimant underwent an EEG and a MRI both showed normal studies. (Tr. 785). She reported continued multiple seizure-like events per month, frequent migrainous headaches, and continued smoking. She recently sought treatment in the emergency room for significant gastrointestinal problems. (Tr. 785). Dr. Lanigar opined she has a history of suspected complex partial seizures and refractory migraine headaches and increased her Topamax dosage and requested she be scheduled for video EEG monitoring to better characterize her events. (Tr. 787).

In the April 9 Admission Note, Claimant presented at the University of Missouri Health Care Hospital complaining of worsening abdominal pain in spite of following a clear liquid diet. (Tr. 859). The doctor noted how she has had several episodes of pancreatitis in the past related to alcohol use. She reported daily seizures lasting anywhere from two to twenty minutes. (Tr. 859). Although she denied alcohol use, she admitted to occasionally binge drinking including last Friday which precipitated this abdominal pain. (Tr. 860). The doctor noted how Claimant reported having several episodes of pancreatitis in the past secondary to alcohol use, but he does not have access to these records. (Tr. 861). In the April 17 Discharge Summary, the doctor noted having difficulty controlling her pain so Claimant was on an IV morphine most of the time.

(Tr. 857). Although the doctor advised Claimant to stay another day, she decided to leave against medical advice. She also left ths hospital floor each day even though she was advised not leave the hospital floor for safety reasons. (Tr. 857).

On April 20, 2011, she returned for treatment after a recent hospitalization for acute pancreatitis. (Tr. 805). "At the time of her admission it was felt that her pancreatitis was due to a concern for drinking that had occurred previous to the admission." (Tr. 805). She was hospitalized for a week. During her hospitalization, she reported a history of multiple episodes of pancreatitis with binge drinking episodes. Although she was advised that it would be more appropriate to stay another day in the hospital, she left against medical advice. Dr. Beard noted how he attempted to provide a prescription for Percocet and advise her to continue a liquid diet for a couple of days, she left before he could meet with her. After reporting seizures, she was advised not to leave the hospital floor but she would do so on a daily basis. (Tr. 805). She is frustrated by the recurring episodes of pancreatitis and "every time they attribute it to alcohol ... she states very adamantly that she does not drink much and she is not certain that this is the cause of her pancreatitis." (Tr. 806). Claimant reported dealing with a lot more stress recently. (Tr. 806). Dr. Beard opined that her acute/chronic pancreatitis seems to be more of a chronic pancreatitis and ordered a number of lab testings and a CT scan of her abdomen. (Tr. 808).

The CT of her abdomen and pelvis showed moderate dilatation of the CBD and the distal pancreatic duct, may be related to postcholecystectomy changes, and no evidence of peripancreatic inflammatory changes, fluid collection or definite obstructive calculus. (Tr. 856).

In follow-up treatment on April 25, she complained of an acute epigastric pain with nausea and vomiting. (Tr. 810). She reported going out drinking the night before this started. She is

doing okay on most of her medications. (Tr. 810). Dr. Beard continued her medications and ordered lab work to address her acute epigastric abdominal pain. (Tr. 813). She returned on April 28 after a recent hospitalization for acute pancreatitis and for an evaluation of her seizure disorder. (Tr. 800). Dr. Beard noted how she recently had been in the hospital for video EEG monitoring, but she was unable to tolerate the monitoring without management of her pancreatitis so she stopped the testing. (Tr. 800). Dr. Beard recommended she continue to follow up with her psychiatrist. (Tr. 801). Dr. Beard opined he would consider whether there is something else more than just alcoholic pancreatitis taking place. (Tr. 803). On May 5, Claimant reported having small issues with seizures and migraines, but she wanted get the GI and her pancreatitis issues under control. (Tr. 795). Dr. Beard noted how the EUS was scheduled the following week with GI and decided he would continue to manage her pain with oxycodone. (Tr. 798).

In the April 25 Admission Note, she reported her episodes prior to a few weeks ago were occurring on a daily basis, but after having medication adjustments to her Depakote and Tegretol, her episodes have become less frequent with the last one occurring three days ago. (Tr. 841). Her medication levels were found to be subtherapeutic, and since then, with adjustments to her Depakote and Tegretol, her episodes have become less frequent with the last one occurring three days ago. (Tr. 841). In the Consultation Note, Dr. Susan Pereira observed Claimant did not appear to be in acute pancreatitis exacerbation as her amylase and lipase are normal. (Tr. 848-49). Claimant reported smoking and not interested in quitting and rare alcohol consumption although she admitted alcohol played a part in her last exacerbation of acute pancreatitis. (Tr. 849-50). In the April 26 Discharge Summary, it was noted how due to Claimant's abdominal pain, the video EEG monitoring was discontinued after twenty-four hours, and she was

discharged on Topamax. (Tr. 840).

The May 13 EUS and EGD showed mild changes of pancreatitis at the head of the pancreatitis, no evidence of chronicity, and normal PD and CBD. (Tr. 838-39).

On May 20, 2011, Claimant was admitted to University of Missouri Health Care Hospital for treatment of nausea, vomiting, and abdominal pain. (Tr. 835). She reported she has had pancreatitis in the past secondary to drinking episodes. (Tr. 835). She denied regular alcohol use but admitted to occasional drinking and a binge drinking episode at the beginning of the month. (Tr. 836). She was admitted for dehydration and to monitor her acute pancreatitis. (Tr. 837). The Brief Narrative Summary of Events noted as follows:

> 31-year-old female with past medical history asthma, fibromyalgias, migraine headaches who has been having nausea, vomiting, right upper quadrant pain. She was admitted for dehydration as she had decreased PO intake and low UOP. At this time, it is thought that this admission is NOT due to pancreatitis. She has had an episode of pancreatitis s/p alcoholic binge and complains that she has never gotten better since 1 month ago after being admitted and left AMA. On the first night, her home regimen of narcotics was kept and she began to refuse this as it "did not work." Then, the patient was given 2 days of IV narcotics of morphine 2 mg IV Q2 PRN again. She was then transitioned to a long acting narcotic with breakthrough. She had attempted to take Oxycontin 10 mg PO BID but felt "funny," and dit not want to take this outpatient. Patient attempted nicotine patch but had a rash and did not want to continue this therapy either. At time of discharge she was refusing pain medications because she stated she didn't need them, she had adequate UOP, and had tolerated a regular diet.

(Tr. 790) (emphasis in original). In the May 24 Discharge Summary, it was noted she was started on Neurontin and to continue taking as outpatient. (Tr. 832). The doctor recommended keeping Claimant on home regimen of oxycodone and opined Dr. Beard could attempt to lower dose of oxycontin if warranted. (Tr. 832-33).

In follow-up treatment on May 26, Dr. Beard noted how she has had a number of hospital

stays recently for acute pancreatitis. (Tr. 790). She reported feeling much better and wanting to be weaned off her narcotics and medications inasmuch as they are too powerful and requested being changed from oxycodone to hydrocodone. (Tr. 791). Her seizures continue to be as well controlled as can be expected. (Tr. 791). Dr. Beard noted how he would wait to see what GI recommends but she is vastly improved today in clinic and continued her medication regimen. (Tr. 794).

The May 27, 2011 x-ray of her left knee showed no significant degenerative changes in the knee joint. (Tr. 831).

On July 19, 2011, Claimant presented in the emergency room reporting she might be pregnant even though she had a tubal ligation. (Tr. 874). She received a 90-tablet refill of Topamax. (Tr. 875). The doctor diagnosed her with nausea. (Tr. 876).

On August 7, 2011, Claimant presented in the emergency room reporting having multiple episodes of seizures and being off Topamax for three weeks after her Medicaid ran out, and not being able afford the medications. (Tr. 869). The doctor refilled her medications including Topamax. (Tr. 870). Psychiatric evaluation showed her mood and affect to be appropriate. (Tr. 871). Her lab testing was positive for urine cannabinoids and benzodiazepine. (Tr. 872-73). Her condition improved with treatment, and she was discharged. (Tr. 873).

On September 17, 2011, she received treatment in the emergency room for a level II trauma resuscitation after being injured in an rear end motor vehicle accident. (Tr. 918). She was the unrestrained middle seat passenger and sustained injury to her neck and the back of her head. (Tr. 918). She arrived in a rigid cervical fully immobilized to a backboard. (Tr. 920). The CT of her cervical spine showed no acute intracranial process and no acute cervical osseous abnormality.

(Tr. 922).  The radiological impression showed no fracture and mild multilevel degenerative

change.  (Tr. 922).  The radiological impression of her left knee showed no fracture, early

osteoarthritis, and small knee joint effusion.  (Tr. 923).  Closed head injury, cervical strain, and

seizure are listed in the clinical impression.  (Tr. 923).  Although she reported previous dose of

morphine did not affect pain at all, the nurse observed how she currently cycled between periods

of moaning, laughing with fiancé, and texting on cell phone.  (Tr. 924).  After being admitted, the

nurse observed Claimant and her fiancé to be agitated and having a disagreement, and Claimant

asked for AMA paperwork and stated "I don't need to be here anymore" and needing a "nicotine

fix."  (Tr. 926, 949-50, 969).  Although strongly advised to stay for further evaluation of her

possible seizure activity, she removed the c-spine collar and tossed it on the floor and left the

hospital against medical advice.  (Tr. 926).

During treatment in the emergency room on September 24, she reported having a seizure

from the patrol car lights after being pulled over by a police officer and during the seizure, she

hurt her back "from the car accident I was in last week."  (Tr. 892).  She reported leaving against

medical advice so she did not get a prescription for pain medication.  (Tr. 893).  The psychiatric

examination showed her affect to be normal and her mood and behavior to be appropriate.  (Tr.

897).  The doctor prescribed Oxycodone, Diazepam, and Ibuprofen and directed her to follow-up

with physical therapy.  (Tr. 898).

Claimant received physical therapy treatment from September 27 through December 3,

2011 at Esquire Sports Medicine.  (Tr. 980-89).  On December 10, she was released from care

after failing to keep her appointment.  (Tr. 990).

The October 22 MRI of her lumbar spine showed an annular disc bulge at L4-5 stable

between neutral and weight bearing views with mild facet arthropathy and resulting mild bilateral foraminal stenosis and no focal disc herniations. (Tr. 973, 986).

On November 16, 2011, Dr. Gregory Stynowick of the Pain Management & Spine Specialists evaluated Claimant for pain management. (Tr. 975). She presented for evaluation of he mid and low back pain radiating into the bilateral lower extremities stemming from a motor vehicle accident on September 17. She reported being told she experienced a seizure when the paramedics evaluated her. (Tr. 975). Dr. Stynowick found examination of the bilateral lower trapezius, bilateral erector spinae, and lower lumbar paraspinous muscle groups to be somewhat inconsistent and noted she seemed "to exaggerate the amount of pain she is experiencing during her examination." (Tr. 976). Dr. Stynowick noted how at times she would be exquisitely tender to the very light palpation over multiple cervical, thoracic, and lumbar paraspinous muscle groups while at other times, the examination could not be reproduced because she is distracted. She would not cooperate with the range of motion testing of her lumbar spine even though she reported pain with any attempt at extension, lateral rotation, and forward flexion of the lumbar spine. (Tr. 976). Dr. Stynowick treated her with a lumbar epidural steroid injection as well as paraspinous trigger point injections. (Tr. 976-78).

On December 18, 2011, she presented in the emergency room and reported a six-year history of petit mal and grand mal seizures and taking Topamax as treatment. (Tr. 993). She has seizures every two to three weeks. She recently moved to Jefferson City and does not have a local neurologist. When she has seizures, she usually goes to the emergency room where she receives intravenous Dilantin. Claimant takes Topamax to control her seizures, but she thinks she may have missed a couple of doses in the last two to three days. She reported living with her new

significant other for the last three weeks, being a cigarette smoker but not consuming alcohol. (Tr. 993). The psychiatric examination showed she has good recall to both remote and recent. (Tr. 994). The emergency room doctor observed Claimant having a seizure lasting thirty seconds with not tonic clonic movements and no postictal state after the seizure. (Tr. 994). The doctor diagnosed Claimant with possible seizures and a migraine and continued her on Topamax and recommended follow-up with Dr. Hooshmand for further evaluation of these episodes. (Tr. 995).

Claimant reported increasingly severe lower abdominal pain associated with some nausea. (Tr. 1003). She reported being a cigarette smoker, but she does not consume alcohol. (Tr. 1003). Ultrasound of her pelvis revealed a complex cyst on the left ovary and right ovary relatively normal. (Tr. 1001, 1004).

On January 29, 2012, Claimant presented in the emergency room complaining of left knee pain and her past medical history of reactive airways disease, epilepsy, and migraine headaches. (Tr. 998). She drinks alcohol but does not smoke cigarettes. (Tr. 998). She was placed in a knee immobilizer for suspected meniscal injury or other internal derangement. (Tr. 999). She previously "chickened out" of surgical repair. (Tr. 999).

In follow-up treatment on February 2, 2012 after an emergency room visit for left knee pain, she requested medication for her mood, pain issues, and anxiety. (Tr. 1015). Dr. Beard prescribed Cymbalta, Neurontin, and a limited amount of Klonopin. (Tr. 1016). She reported having seizures once a week or once every two weeks and still working on her disability and indicated "that she would very much like to have a letter or something for her court date for her disability case." (Tr. 1016).

Dr. John Krautmann, an orthopedic surgeon, examined Claimant on February 14 and

found a small effusion and noted she is "very tender in general about the knee and it is very difficult to tell what might be hurting her." (Tr. 1023). Dr. Krautmann scheduled a MRI of her knee. (Tr. 1023). The February 29 MRI of her left knee revealed no meniscal tears and no discoid meniscus, and small joint effusion. (Tr. 1022).

## IV. The ALJ's Decision

The ALJ found that Claimant has not engaged in substantial gainful activity since September 13, 2010, the application date. (Tr. 12). The ALJ found that the medical evidence establishes that Claimant has the following severe impairments: seizure disorder, asthma, alcohol abuse disorder, bipolar disorder, and alcohol-induced pancreatitis, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4 but that her impairments would preclude her from performing any work that exists in significant numbers in the national economy. (Tr. 13, 17). Nonetheless, because her impairments included substance abuse, the ALJ then reevaluated her claim in the absence of substance abuse. (Tr. 17). In the absence of substance abuse, the ALJ determined she would still have the severe impairments of bipolar disorder and seizure disorder, but she did not have an impairment or combination of impairments listed in or medically equal to one contained in the Listings. The ALJ found that Claimant retained the residual functional capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently; to sit six hours in an eight-hour workday; and to stand and/or walk six hours. (Tr. 15). The ALJ further found she could only frequently crawl, crouch, kneel, stoop, and climb ramps or stairs, and can never climb ladders, ropes, or scaffolds. In addition, she needed to avoid concentrated exposure to extreme cold, extreme heat, extreme wetness, extreme humidity, irritants, chemicals, extreme vibration, and

concentrated exposure to operational control of dangerous moving machinery, and workplace hazards such as unprotected heights and dangerous moving machinery. The ALJ further limited Claimant to simple and routine tasks that require only occasional interaction with the public, and she would have at least three unscheduled work absences a month. (Tr. 15). The ALJ determined that Claimant has no past relevant work. (Tr. 16). The ALJ noted her birthday is August 29, 1979, making her a younger individual on the filing date of the application. Claimant has at least a high school education and is able to communicate in English. The ALJ opined transferability of job skills is not an issue inasmuch as she does not have past relevant work. (Tr. 16). The ALJ found Claimant's impairments would not preclude her from performing work that exists in significant numbers in the national economy including work as a retail marker, folding machine operator, and collator operator. The ALJ opined the substance use disorder is a contributing material factor to the determination of disability because Claimant would not be disabled if she stopped the substance use. (Tr. 21). Inasmuch as the substance use disorder is a contributing factor material to the determination of disability, the ALJ found she has not been disabled within the meaning of the Social Security Act at any time from the date the application was filed through the date of this decision. (Tr. 21).

## V.     Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age,

education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts when required which

is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935

(8th Cir. 2008). "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730

(quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision. Id. The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d

1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at

730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the agency's findings, the [Court] must affirm the agency's decision."

Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792,

798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's

decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the

record as a whole, because the ALJ failed to find she meets Listing 11.02 or 11.03. Next,

Claimant contends that the ALJ failed to properly formulate her RFC inasmuch as the ALJ failed to link the limitations assessed with the medical evidence of record and properly assess her credibility.

## A.  Listings 11.02 and 11.03

Claimant contends that the ALJ erred by not finding she satisfies either Listings 11.02 or 11.03.  The burden is on Claimant to prove that her seizure disorder satisfies these Listings.  See Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010).

An impairment is medically equivalent to a listing under the regulations if it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a). The claimant bears the burden of proving that she meets or equals a listing.  See Pyland v. Apfel, 149 F.3d 873, 877 (8th Cir. 1998). Listing 11.02 requires "convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment," plus "[d]aytime episodes (loss of consciousness and convulsive seizures)" or "[n]octurnal episodes manifesting residuals which interfere significantly with activity during the day."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02.  Listing 11.03 requires "nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.  With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." § 11.03.

The undersigned first notes that the ALJ did make a finding that Claimant "does not have

- 32 -

an impairment or combination or impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (Tr. 13). Given that she considered the criteria of the listings in her analysis, it is likely that she did consider whether she equaled those listings. In addition, even if the ALJ did not specifically state whether Claimant equaled Listing 11.03, the undersigned finds that no reversal is required, because Claimant has not met her burden of proving that she equals the listing. An ALJ's failure to make a statement regarding a specific listing does not require reversal where the evidence as a whole supports the finding that the claimant does not meet or equal that listing. See, e.g., Boettsher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011) ("There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record."); Bentley v. Astrue, 11-4248-CV-C-ODS, 2012 WL 2426842, at *2 (W.D. Mo. June 26, 2012) (holding that the ALJ's failure to address whether Plaintiff met or equaled a specific listing did not require reversal where there was no compelling evidence to support the conclusion that Plaintiff met or equaled the criteria of that listing). The ALJ found that Claimant did not meet the criteria for Listing 11.02 because there was no evidence of seizures occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. The objective medical evidence supports this finding. Thus, the undersigned finds that the record as a whole supports the ALJ's determination.

Claimant's reliance on the medical evidence to establish that she satisfies Listing 11.02 fails. The evidence in the record satisfies the criteria in the introductory paragraph of Listing 11.02 that her seizures follow a typical seizure pattern and occur more frequently than once a month "in spite of at least 3 months of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App.

1 § 11.02. "To meet a listing, an impairment must meet all of the listing's specified criteria."

Carlson, 604 F.3d at 593 (quoting Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004)).

The listings can only be applied if the impairment persists despite the fact that the individual is following the prescribed antiepileptic treatment. As noted by the ALJ, "there is no evidence of seizure occurring more frequently than once weekly or monthly, despite treatment. The claimant's alleged seizures do not occur with the required frequency, and her alcohol abuse, as well as significant medication non-compliance attribute to her seizures." (Tr. 13-14). The record shows on April 4 and September 7, 2010, the blood tests revealed she had subtherapeutic levels of medication. In the April 25, 2011 treatment note, her medication levels were found to be subtherapeutic. On November 3, 2010, Dr. Lanigar noted how her seizure episodes prior to a few weeks ago were occurring on a daily basis and after medication adjustments, her episodes have become less frequent and noted she has had problems with compliance in the past. In follow-up treatment with Dr. Beard on November 19, 2010, Claimant reported overall she is doing much better and after starting Topamax and Carbatrol, she is doing okay with her seizures. In the April 25 treatment note, she reported her episodes prior to a few weeks ago were occurring on a daily basis, but after having medication adjustments to her Depakote and Tegretol, her episodes have become less frequent. Her medication levels were found to be subtherapeutic, and since then, with adjustments to her Depakote and Tegretol, her episodes have become less frequent. On August 7, 2011, Claimant presented in the emergency room reporting having multiple episodes of seizures and being off Topamax for three weeks after her Medicaid ran out and not being able afford the medications. The doctor refilled her medications including Topamax. Thus, there is no evidence that she was denied the medication by any health care provider after telling the doctor

she could not afford the medication. <u>See</u> <u>Johnson v. Bowen</u>, 866 F.2d 274, 275 (8th Cir. 1989) (rejecting claimant's argument that his failure to take prescribed medication should be excused because he could not afford it in case in which there was no evidence that claimant had told his physician he was unable to afford the medication). During treatment in the emergency room in September, although strongly advised to stay for further evaluation of her possible seizure activity, she removed the c-spine collar and tossed it on the floor and left the hospital against medical advice. On December 18, 2011, she presented in the emergency room and reported a six-year history of petit mal and grand mal seizures and taking Topamax as treatment, but she thinks she may have misses a couple of doses in the last two to three days. The undersigned finds the record shows evidence of noncompliance with medications and does not establish she had seizures for a period of three months in spite of at least three months of prescribed treatment. As noted by the ALJ, Claimant admitted noncompliance with anticonvulsant medications, and the record contains objective evidence of noncompliance.

Although Claimant consistently reported experiencing seizures on a daily basis and testified at the hearing that she experiences grand mal seizures two to three times a month and petit mal seizures four to five time a week, the undersigned finds medical objective medical does not substantiate such frequency. Likewise, her mother's statement does not corroborate she experiences a grand mal seizure at least once a month. The ALJ assigned diminished weight to her mother noting how her mother lives in Georgia and "much of her letter focused on the claimant's history, rather than the effects of her currently alleged disabling seizure disorder. In addition, her statements of seizure activity are entirely based on the claimant's statements to her over the telephone." (Tr. 19). The reference in her mother's statement to the frequency of

Claimant's seizures clearly relies on her report of such. As noted by the ALJ, "the objective medical findings and signs concerning the claimant's alleged seizures are quite limited..." and "[s]he has frequently sought treatment for seizures since the alleged onset date, but the evidence indicates that it was in large part due to her alcohol abuse and medication non-compliance." (Tr. 18). Further, the ALJ noted how "doctors referred to her reports as 'questionable seizure activity'" and "the objective evidence and signs are quite limited as outlined above, and fail to reveal strong evidence of a seizure disorder." (Tr. 18). The undersigned notes that during a more recent treatment note, Claimant reported still working on her disability and indicated "that she would very much like to have a letter or something for her court date for her disability case."

Likewise, the record shows that when Claimant was compliant with medications, she did not have the required frequency of seizures to meet Listing § 11.03. During treatment in December, 2011, she reported a six-year history of petit mal and grand mal seizures and taking Topamax as treatment and having seizures every two to three weeks, but she thinks she may have missed a couple of doses in the last two to three days. In follow-up treatment in February, 2012, Claimant reported having seizures once a week or once every two weeks. As noted by the ALJ, since the alleged onset date, she has sought emergency treatment at least seven times but on only four of those occasions did she report having seizures. The ALJ noted Claimant has only sought treatment with complaints of seizures four times in the twenty-one months since her alleged onset date. Thus, the record before the ALJ does not establish that Claimant did not have seizures more than once a week as required by Listing § 11.03.

B.    **Residual Functional Capacity and Credibility Determination**

A claimant's RFC is what he can do despite his limitations. <u>Dunahoo</u> 241 F.3d at 1039.

The claimant has the burden to establish his RFC.  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a).  The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand.  Id.

The ALJ found that Claimant has the residual functional capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently; to sit six hours in an eight-hour workday; and to stand and/or walk six hours.  (Tr. 15).  The ALJ further found she could only frequently crawl, crouch, kneel, stoop, and climb ramps or stairs, and can never climb ladders, ropes, or scaffolds.  In addition, she needed to avoid concentrated exposure to extreme cold, extreme heat, extreme wetness, extreme humidity, irritants, chemicals, extreme vibration, and concentrated exposure to operational control of dangerous moving machinery, and workplace hazards such as unprotected heights and dangerous moving machinery.  The ALJ further limited Claimant to simple and routine tasks that require only occasional interaction with the public, and she would have at least three unscheduled work absences a month.

The undersigned will begin with a review of the ALJ's credibility determination.  See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (it is clearly established that, before

determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility).

The Eighth Circuit has recognized that, due to the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski, 739 F.2d 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and set forth the following standard:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

A claimant's complaints of pain or symptoms "shall not alone be conclusive evidence of disability ... there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques." Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) (citing 42 U.S.C. § 423(d)(5)(A). An ALJ may not disregard subjective complaints merely because there is no evidence to support them, but may disbelieve such allegations due to "inherent inconsistencies or other circumstances." Id. (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)); see also Polaski, 739 F.2d at 1322 (although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole). The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The

credibility of a claimant's subjective testimony is primarily for the ALJ, not this Court, to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez, 403 F.3d at 957. When an ALJ considers the Polaski factors and discredits a claimant's subjective complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).

In her decision the ALJ thoroughly discussed the medical evidence of record, her noncompliance with medical treatment, questionable work history and poor earnings record, and her hearing testimony. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ noted that although Claimant asserts that she is unable to work due to seizures, bipolar, borderline personality disorder, PTSD, and fibromyalgia, the clinical and objective medical findings are inconsistent with an individual experiencing totally debilitating symptomatology. In support, the ALJ cited to the treatment notes of record, the improvement on medication and her noncompliance. The ALJ then addressed other inconsistencies in the record to support her conclusion that Claimant's complaints were not credible.

Specifically, although Claimant testified to greatly reduced daily activities, the ALJ noted that no treating physician in any treatment notes stated that Claimant was disabled or unable to work or imposed significant long-term physical and/or mental limitations on Claimant's capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The absence of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012); Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Further, the ALJ noted how the objective evidence and signs of seizures were quite limited and failed to reveal strong evidence of seizure disorder.

Likewise, the ALJ noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment and how on at least seven occasions when seeking emergency treatment after the alleged onset date, she did not report seizures. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling

condition).  Likewise, the ALJ noted she has only sought treatment with complaints of seizures four times in the twenty-one months since her alleged onset date.[4]

In support of her credibility findings, the ALJ noted that Claimant's noncompliance with treatment greatly detracted from her credibility.  The ALJ also noted the primary aggravating factor on the record is Claimant's failure to take medication.  A lack of desire to improve one's ailments by failing to follow suggested medical advice detracts from a claimant's credibility.  See Dunahoo, 241 F.3d at 1037 (claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain); Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to treatment do not support a finding of disability, and failure to follow a prescribed course of remedial

---

[4]Claimant's assertion that her lack of neurological follow-up and general care by a primary care physician due to lack of income and resources is without merit as noted by the ALJ.  The record is devoid of evidence suggesting that Claimant sought and received treatment offered to indigents.  See Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992)(holding the mere use of nonprescription pain medication is inconsistent with complaints of disabling pain); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992)(finding it is inconsistent with the degree of pain and disability asserted where no evidence exists that claimant attempted to find any low cost medical treatment for alleged pain and disability).  The record does not document that Claimant was ever refused treatment due to insufficient funds.  See Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003) (recognizing that a lack of funds may justify a failure to receive medical care; however, a plaintiff's case is buttressed by evidence he related of an inability to afford prescriptions and denial of the medication); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (If a claimant is unable to follow a prescribed regimen of medication and therapy to combat his difficulties because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits); Murphy, 953 F.2d at 386.  The fact that a claimant is under financial strain, however, is not determinative.  Id.  Here, as the ALJ points out, the record is devoid of any credible evidence showing that Claimant was denied treatment due to lack of finances and thus inferred that Claimant did not seek more frequent medical treatment more often, because she did not have a medical need for such treatment.  Case law permits the ALJ's reasonable inferences.  See Pearsall v. Massanari, 274 F.3d 1218.  Likewise, the record is devoid of any evidence showing that Claimant had been denied medical treatment or access to prescription medications on account of financial constraints.  See Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994).

treatment, including cessation of smoking, without good reason is grounds for denying an application for benefits); Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989) (holding that an ALJ can discredit subjective complaints of pain based on claimant's failure to follow a prescribed course of treatment). During treatment on April 4 and September 7, 2010, the blood tests showed she had subtherapeutic levels of medication. In the April 25, 2011 treatment note, her medication levels were found to be subtherapeutic. On August 7, 2011, Claimant presented in the emergency room reporting having multiple episodes of seizures and being off Topamax for three weeks after her Medicaid ran out, and not being able afford the medications. The doctor refilled her medications including Topamax. During treatment in the emergency room in September, although strongly advised to stay for further evaluation of her possible seizure activity, she removed the c-spine collar and tossed it on the floor and left the hospital against medical advice. On December 18, 2011, she presented in the emergency room and reported a six-year history of petit mal and grand mal seizures and taking Topamax as treatment but she thinks she may have misses a couple of doses in the last two to three days. On December 10, she was released from care of the physical therapist after failing to keep her appointment. See Eichelberger, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff canceled several physical therapy appointments and that no physician imposed any work-related restrictions on her). The medical records show Claimant was routinely noncompliant with her medical treatment, and when noncompliant with her medication regimen, she deteriorated and her symptoms intensified. See Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability."); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (noting that if impairment can be controlled by treatment, it cannot be

considered disabling). The lack of regular neurological health treatment further detracts from her credibility.

Further, the ALJ evaluated other inconsistencies in the record[5] including contradictions between Claimant's sworn testimony regarding how she does not drink alcohol and the hospital records revealing treatment for acute intoxication weighs against the claimant's credibility. Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) (finding a lack of credibility when claimant's testimony regarding drinking consumption conflicted with medical documentation). Indeed, the record shows during a psychological evaluation by Dr. Spencer on February 5, 2009, she denied any alcohol use/abuse present and past. On October 1, 2010, she reported not using alcohol or illicit drugs. In the April 9, 2011 hospital treatment note, the doctor noted how she has had several episodes of pancreatitis in the past related to alcohol use. Although Claimant denied alcohol use, she admitted to occasionally binge drinking including last Friday which precipitated this abdominal pain. In follow-up treatment on April 25 with Dr. Beard, she complained of an acute epigastric pain with nausea and vomiting and going out drinking the night before this

_____

[5] The undersigned notes another inconsistency in the record is Claimant's possible symptom magnification. An examining physician also noted signs of symptom magnification. See Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006) (ALJ may draw conclusions from claimant's exaggeration of symptoms in evaluating subjective complaints). During treatment, Dr. Stynowick found examination of the bilateral lower trapezius, bilateral erector spinae, and lower lumbar paraspinous muscle groups to be somewhat inconsistent and noted she seemed "to exaggerate the amount of pain she is experiencing during her examination." Dr. Stynowick further noted how at times she would be exquisitely tender to the very light palpation over multiple cervical, thoracic, and lumbar paraspinous muscle groups while at other times, the examination could not be reproduced because she is distracted. She would not cooperate with the range of motion testing of her lumbar spine even though she reported pain with any attempt at extension, lateral rotation, and forward flexion of the lumbar spine. E.g., Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (physicians' statements of symptom exaggeration, coupled with tests that were inconsistent with complaints of pain, supported ALJ's adverse credibility determination).

started.  During treatment for nausea, vomiting, and abdominal pain on May 20, 2011, she denied

regular alcohol use but admitted to occasional drinking and a binge drinking episode at the

beginning of the month.  As such, the undersigned finds that the ALJ's consideration of the

discrepancies between Claimant's testimony and the treatment records is supported by substantial

evidence.

Finally, the ALJ cited Claimant's very questionable work history, "achieving earnings in

excess of substantial gainful activity in no year since she completed her formal education.  This

indicates a lack of work motivation and diminishes her overall credibility" (Tr. 19).  A poor work

history lessens a Claimant's credibility.  See Fredrickson v. Barnhart, 359 F.3d 972, 976-77 (8th

Cir. 2004)(holding that claimant was properly discredited due, in part, to her sporadic work

record reflecting low earnings and multiple years with no reported earnings, pointing to potential

lack of motivation to work);Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993); see also

Ramirez v. Barnhart, 292 F.3d 576, 581-82 (8th Cir. 2002) (poor work record and financial

motivation for benefits may contribute to adverse credibility determination when other factors cast

doubt upon claimant's credibility); Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (a

poor work history "may indicate a lack of motivation to work, rather than a lack of ability.");

Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (low earnings and significant breaks in

employment cast doubt on complaints of disabling symptoms).   This is a proper consideration.

See Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011); accord Wildman v. Astrue, 596 F.3d

959, 968-69 (8th Cir. 2010).  The record reflects Claimant's highest earnings were $2,951.46 in

2000.  (Tr. 241).

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC

those impairments and restrictions found to be credible.  See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record.").  The ALJ determined that the medical evidence supported a finding that Claimant could perform light work with the additional limitations of no concentrated exposure to extreme temperatures, extreme humidity, extreme wetness, or pulmonary irritants.  The ALJ further limited her to simple and routine tasks that require only occasional interaction with the public.  The vocational expert testified in response to hypothetical questions, that incorporated the same limitations as the RFC, and opined that such individual could perform work as a retail marker, folding machine operator, and collator operator.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support her finding that Claimant is not disabled.  Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible.  Although the ALJ did not explicitly discuss each Polaski factor in making her credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints.  See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).  Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court.  Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).  Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not

entirely credible, the undersigned defers to the ALJ's credibility findings. See Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before her and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included the medical evidence of record, her noncompliance with medical treatment, questionable work history and poor earnings record, and her hearing testimony. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints of pain. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

Claimant's contention that the ALJ improperly failed to include a limitation on interaction with co-workers or supervisors citing the opinion of Dr. Long is without merit. The ALJ found Dr. Long's opinion based on a one-time evaluation was inconsistent with the objective medical

evidence in the record.   See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the

doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can

accord it less weight.").  As noted by the ALJ, the majority of the medical evidence shows

Claimant to be stable on prescribed medications as evidenced by the lack of significant mental

health treatment.   Further, Dr. Long's opinion predated the relevant period in the instant case,

September 13, 2010, the protective filing date.

In the May 2010 Mental Residual Functional Capacity, Dr. Doxsee found Claimant to be

moderately limited in her ability to understand and remember detailed instructions, to carry out

detailed instructions, and to maintain attention and concentration for extended periods.  Dr.

Doxsee further found her to be moderately limited in her ability to get along with coworkers and

noted she can interact adequately with peers and supervisors in a work like setting.  As noted by

the ALJ, Dr. Doxsee never examined Claimant and did not have access to most of the evidence in

the record including any evidence from the period relevant to her pending claim for benefits.  The

undersigned finds the ALJ reasonably found based on the essentially normal psychiatric findings

and the lack of any ongoing treatment with a mental health specialist during the relevant time

period, her mental impairments were reasonably controlled and did not result in the degree of

limitations as opined by Dr. Doxsee.

A review of the ALJ's decision shows the ALJ to have conducted an exhaustive review of

the medical evidence of record, including opinion evidence and observations of treating physicians

and others.  The ALJ evaluated all of the opinion evidence of record and provided good reasons

for the weight accorded to each opinion.  Substantial evidence on the record as whole supports

the ALJ's determination as to the weight he accorded the opinion evidence in this cause.

In addition, upon conclusion of her discussion of specific medical records, nonmedical evidence, and the consistency of such evidence when viewed in the light of the record as a whole, the ALJ assessed her RFC and specifically set out Claimant's non-exertional limitations and work-related activity Claimant could perform based on the evidence available in the case record. Because the medical records provide some medical evidence to support the ALJ's RFC determination, the determination must stand. See Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008). Although not all of the medical evidence "pointed in that direction," there nevertheless was a sufficient amount that did. The ALJ's determination must therefore be upheld even if the record could also support an opposite decision. See Moad v. Massanari, 260 F.3d 887, 891 (8th Cir. 2001). See also Phillips v. Colvin, 721 F.3d 623, 629 (8th Cir. 2013) (it is the duty of the Commissioner to resolve conflicts in the medical evidence).

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**. A

separate Judgment in accordance with this Memorandum and Order is entered this same date.


_____/s / Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this __24th__ day of February, 2015.